# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEONARD F. IACONO, SR. and SOVEREIGN PROPERTY MANAGEMENT, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 11841-VCL |
| ESTATE OF JOSEPH M. CAPANO, JOANNE M. CAPANO, WS MERRIMAC CENTER LLC, JMC ACQUISITIONS, INC., and JAMCAP MANAGEMENT, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 13, 2020
Date Decided: June 29, 2020

William D. Sullivan, SULLIVAN HAZELTINE ALLINSON LLC, Wilmington, Delaware; Philip S. Rosenzweig, SILVERANG, ROSENZWEIG & HALTZMAN, LLC, King of Prussia, Pennsylvania; *Counsel for Plaintiffs.*

R. Karl Hill, SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, Delaware; *Counsel for Defendants.*

**LASTER, V.C.**

The plaintiffs sued to enforce an oral agreement to form a joint venture that would acquire and develop real estate. The plaintiffs also asserted other theories of recovery.

The defendants moved for summary judgment, arguing that an oral agreement could not have existed. In their reply brief, the defendants argued that if the court agreed, then that ruling should also result in summary judgment in the defendants' favor on the plaintiffs' other claims.

When considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-movants. Examined in that light, the evidence could support a finding that an enforceable oral agreement existed. The defendants' motion for summary judgment on that issue is therefore denied. There is accordingly no need to reach the defendants' belated contention that judgment should be entered on the plaintiffs' other theories.

## I.        FACTUAL BACKGROUND

The facts are drawn from the evidence that the parties submitted in connection with the defendants' motion for summary judgment. At this procedural stage of the case, the evidence must be construed in favor of the non-movants. The facts are written from that perspective. The record at trial may support different factual findings.

### A.        The Joint Venture For Phase 3

Plaintiff Leonard Iacono is a seasoned real estate developer. He owns and operates plaintiff Sovereign Property Management, LLC., a property management company.

The late Joseph Capano was also a seasoned real estate developer. His many successful projects included Phases 1 and 2 of a master plan for the development of 1,100

acres in Middletown, Delaware, known as the "Westown Master Plan." Together, Phases 1 and 2 comprised a commercial development known as the "Shoppes of Westown." Iacono also bid on Phases 1 and 2, but Capano secured and completed the projects.

Iacono and Capano met as a result of a lawsuit, but they subsequently became close friends. For years, Iacono and Capano talked about developing real estate together.

In June 2015, Capano learned about an opportunity to bid on the third phase of the Westown Master Plan ("Phase 3" or the "Project"), which was then owned by Westown Retail 42 Acres, LLC ("Westown Retail"). Phase 3 involved the purchase and subsequent development of approximately twenty-two acres adjacent to Phases 1 and 2.

Capano contacted Iacono, and they talked about bidding on Phase 3 together. On June 16, 2015, Capano sent Iacono a set of projections for Phase 3. *See* Dkt. 51 Ex. 6. As anticipated, on Thursday, June 18, 2015, Capano received a request for proposal to bid on Phase 3.

Capano invited Iacono to join him at Kings Creek Country Club on Saturday, June 19, 2015, to play golf and discuss Phase 3. Iacono testified that after playing golf, he and Capano agreed that "we were going to acquire [Phase 3] and that we were going to be 50/50." Iacono Dep. 34. Iacono understood that "we would each be 50 percent partners in the acquisition and development of the property." *Id.* at 37. Iacono and Capano agreed that "an actual entity was going to be formed that was going to own the property" and that Capano would send Iacono a draft LLC agreement. *Id.* They discussed some of the initial tasks that their venture would require, agreeing that Capano would handle the negotiations to acquire the Project and Iacono would take the lead on obtaining the financing. *Id.* at 40.

2

Iacono understood that "me and him would collectively design the center and build it," but Iacono "had no problem with [Capano] overseeing the construction of it." *Id.*; *accord id.* at 43 (agreeing that Capano would "[o]versee the construction" but not agreeing that Capano would control construction). They also agreed that Capano's property management company would serve as the property manager for the Project once it was built and leased. *Id.* at 38–39.

That same day, Capano submitted a draft letter of intent for Phase 3, constituting his bid to acquire the Project. Capano caused one of his real estate companies, defendant JMC Acquisitions, Inc., to submit the letter of intent. In reliance on his agreement with Capano, Iacono did not bid. *See id.* at 29, 75. If he had not reached agreement with Capano, then Iacono would have bid. *Id* at 75. On June 19, JMC Acquisitions and Westown Retail entered into a letter of intent for Phase 3.

After the meeting at Kings Creek Country Club, Iacono and Capano told their associates about their agreement. Iacono told Darren Caterino, his principal real estate advisor, that he and Capano had agreed to acquire Phase 3 and "collectively design the center and build it." *Id.* at 40. Capano told Joseph Terranova and Sandra Duchemin, two of his senior employees, that he planned to partner with Iacono for Phase 3. *See* Terranova Dep. at 64–65; Duchemin Dep. 34–37, 103.

## B.    The First Draft

On July 13, 2015, Capano sent Iacono a draft of an LLC agreement (the "First Draft"). Dkt. 49 Ex. D. The First Draft was a simple and straightforward document.

Consistent with the oral agreement reached at Kings Creek Country Club, the First Draft contemplated a 50/50 ownership structure. *See id.* The draft designated Capano as the "Class A Member" with a 50% member interest and Iacono as the "Class B Member" with a 50% member interest. *See id.* § 12.

The First Draft departed from the 50/50 structure in only one respect. It provided that only the Class A Member had the authority to manage the business and affairs of the LLC. *See id.* The Class B Member did not have any power to manage the business and affairs of the LLC. The Class B member also did not generally have any voting rights, although the LLC could not engage in a list of nine significant actions without the consent of the Class B Member. *Id.*

The First Draft did not distinguish among phases of the Project for purposes of allocating management authority. In simplified terms, real estate projects can be thought of as having three phases: (i) the planning and design phase, (ii) the construction phase, and (iii) the post-construction and stabilization phase. By vesting all authority in the Class A Member, the First Draft gave Capano control over all phases of the Project.

The First Draft contained a general prohibition on the members receiving compensation from the LLC in their capacity as members. *Id.* § 13. As an exception to the general prohibition, the First Draft stated that the LLC "may enter into a property management agreement with an affiliate of the Class A Member to manage the Property, upon such terms that are customary in the industry, including, without limitation a fee equal to five percent (5%) of the gross income derived from the operation of the Property." *Id.* This provision reflected Iacono and Capano's oral agreement that Capano's property

4

management company would serve as the property manager for Phase 3 once the Project was built and leased. Iacono Dep. at 38–39.

Capano's First Draft thus reflected an understanding of the 50/50 arrangement in which Capano and Iacono would be equal partners from an economic perspective, but where Capano would control the entity. Iacono understood at the time that Capano was "a pretty independent individual" who almost always had complete control over his real estate projects. Iacono Dep. 23.

## C.     Iacono Rejects The First Draft.

Iacono rejected the First Draft. In an email to Capano sent on July 15, 2015, Iacono objected that "the rights of the Class B member are very limited" and insisted that he "must be on the same pecking order" with Capano. Dkt. 49 Ex. E. He stated, "We obviously need to resolve this before we can proceed." *Id.*

Capano emailed back, "What part is a problem for you?" *Id.* Iacono responded colorfully that the First Draft treated him "like a red headed step child." *Id.* He stated, "Therefore before I comment on the balance of this agreement this matter must be resolved first. If we are 50/50 partners then we should be on a level playing field." *Id.*

Capano wrote back: "Other than daily management control we are on the same playing field." *Id.* That was a fair description of the First Draft, in which Iacono and Capano had equal economic rights, but only Capano had control.

Capano then told Iacono, "Go ahead and change whatever you want and send it back[.] *We should be equal in all respects*." *Id.* (emphasis added). Construed in favor of Iacono for purposes of the defendants' motion for summary judgment, this email indicates

5

that Capano agreed to Iacono's position that they should be "equal in all respects," including on management.

Iacono testified that he spoke with Capano about the draft by telephone. Iacono Dep. 45, 101. Iacono had the impression that Capano understood what the deal was and had sent the First Draft as a test, not expecting Iacono to sign it. *Id.* at 45. Capano told Iacono to send back a proposed draft with his changes. *Id.*

**D.     The Second Draft**

Iacono did not immediately send back changes to the First Draft. He had an attorney, Doug Hershman, prepare a new agreement from scratch. *See* Iacono Dep. 46–47.

Preparing the new agreement took time. On August 3, 2015, before receiving the new draft, Capano caused JMC Acquisitions to send a draft purchase and sale agreement for the Project to Westown Retail. Dkt. 49 Ex. B. Later that day, Caterino sent Iacono's proposed LLC agreement to Capano. *See* Dkt. 49 Ex. F (the "Second Draft"). Caterino told Capano that Iacono had "not yet reviewed" the Second Draft but asked Capano to review it and offer comments. *See* Dkt. 49 Ex. F; Caterino Dep. 124. The next day, Capano sent the Second Draft to his lawyer, Daniel Krapf. *See* Dkt. 49 Ex. F.

Like the First Draft, the Second Draft provided that Capano and Iacono would each own a 50% member interest in the LLC. Unlike the First Draft, where the Class B Member only had a consent right on specific issues, the Second Draft provided for both members to have voting power proportionate to their member interest. *See id.* at '882–83.

The most significant departure from the First Draft was in the area of management. In contrast to the First Draft, which used a member-managed structure in which only the

6

Class A Member had management rights, the Second Draft established a manager-managed structure. It identified Capano and Iacono as the initial managers and provided that the LLC only would be able to take action with the joint approval of both managers. *See* Dkt 49 Ex. F at '879–80. Like the First Draft, the Second Draft did not distinguish among phases of the Project for purposes of allocating management authority. It implicitly contemplated the same control structure for all phases.

Like the First Draft, the Second Draft addressed the ability of members to receive compensation from the LLC. Establishing the opposite default rule, the Second Draft provided that the members and their affiliates *could* receive compensation from the LLC. The Second Draft specifically authorized the LLC to enter into a property management agreement with a Capano affiliate, although it reduced the fee to 3.5% of rental income. *See id.* at '881.

Generally speaking, the Second Draft was a much more sophisticated and detailed document. It contained a number of provisions that anticipated issues which could arise in a 50/50 venture. Among other things, it

- Included an extensive set of definitions. *See* Dkt. 49 Ex. F at '867–70.

- Contained detailed provisions addressing the admission of new members and the extent to which members could transfer their interests. *See id.* at '867–71

- Provided that when making distributions, a member would receive a "Preferred Return" of 8% per annum on a member's "Excess Unreturned Capital," defined as a situation in which the amount of one member's unreturned capital exceeded the other member's. *See id.* at '868, '870, '877.

- Established a dispute resolution section that attempted to address disagreements first through mediation and then through arbitration. *See id.* at '890–91.

7

- Introduced a put/call mechanism for resolving deadlock through a consensual buyout. *See id.* at '875–76.

- Expanded the single paragraph on indemnification found in the First Draft to five separate sections addressing indemnification and advancement rights. *See id.* at '884–85.

In each case, the Second Draft treated the members equally. Although it added these deal points, the Second Draft was a 50/50 venture in which the members had equal rights.

Like the First Draft, the Second Draft did not specify a dollar amount of capital that each member would contribute. *See id.* at '893. That was understandable, since the parties had not yet agreed on the total amount they would need to invest. There was no indication that the Second Draft altered the 50/50 agreement on contributing capital that Iacono and Capano had reached.

In sum, the Second Draft reflected an understanding of the 50/50 arrangement as a joint venture in which Capano and Iacono were equal in all respects. The draft was thus consistent with Iacono's understanding and with Capano's email in which he stated, "We should be equal in all respects." Dkt. 49 Ex. E.

### E. Capano's Death

On August 11, 2015, Capano unexpectedly died. Before his death, Capano briefly discussed the Second Draft with Krapf. *See* Krapf. Dep. 61. Capano had not provided Iacono with any comments.

Joanne Capano, his widow, became the executrix of his estate and took over the management of his businesses. To avoid confusion, this decision refers to Joanne using her first name. Terranova became the point person for the Capano team on Phase 3.

8

**F.     The Continued Pursuit Of Phase 3**

Despite Capano's death, Joanne decided to continue pursuing Phase 3 with Iacono. She believed it was what Capano would have wanted. *See* Joanne Dep. 59.

On August 14, 2015, the Capano team caused JMC Acquisitions to execute a formal agreement with Westown Retail for the purchase of Phase 3 (the "Purchase Agreement"). The Purchase Agreement contemplated a purchase price of $4.95 million, a deposit of $250,000, a due diligence period, and a closing within thirty days. Led by Caterino, Iacono's team began due diligence. *See* Dkt. 51 Ex. 12.

As due diligence progressed, the Capano side's enthusiasm for the joint venture waned. Terranova, Duchemin, and Joanne disliked and distrusted Iacono. *See* Terranova Dep. 57; Duchemin Dep. 37; Joanne Dep. 29. Outwardly, they continued to support the joint venture. *See* Dkt. 51. Exs. 13, 15, 16. Internally, they began developing a backup plan if the relationship broke down. *See, e.g.*, Dkt. 51. Ex. 18. Unaware of the Capano team's growing antipathy towards the joint venture, the Iacono side continued to move forward with due diligence and began the process for securing financing. *See* Dkt. 51 Ex. 20.

**G.     The Third Draft**

On September 2, 2015, Terranova sent a markup of the Second Draft to Iacono and his team. Dkt. 49 Ex. H (the "Third Draft"). Because it was a markup rather than a rewrite, the Third Draft retained the Second Draft's organization, including the manager-managed structure. Generally speaking, the Third Draft broadly accepted Iacono's version of the agreement, while proposing minor changes.

9

Some of the changes reflected the fact that Capano had died. The Second Draft had identified Capano as one of the initial managers of the LLC. He obviously could no longer serve in that role. The Third Draft identified defendant JAMCAP Management, Inc., one of Capano's companies that Joanne now controlled, as the initial manager. *See id.* § 5.01(a). In retaining the manager-managed structure and providing for equal management, the Third Draft did not distinguish among (i) the planning and design phase, (ii) the construction phase, and (iii) the post-construction and stabilization phase. *See generally id.* The Third Draft thus adopted the 50/50 management structure that Iacono believed that he and Capano had agreed upon, and which was consistent with Capano's statement in his email about being "equal in all respects." Dkt. 49 Ex. E.

Just as he could no longer serve as a manager, Capano also could no longer serve as a member of the LLC. The Third Draft identified a special purpose vehicle—WS Phase 3, LLC—as the entity from the Capano side that would serve as the member. *See* Dkt. 49 Ex. G § 1.01.

Most of the Capano team's other revisions were minor. They lowered the preferred return from 8% to 6% and provided that it would not accrue for the first thirty days. *See id.* § 1.01. They made some edits to the arbitration provision, and they struck the put/call mechanism that would be used in the event of deadlock. *See id.* §§ 3.05, 10.8(b).

A significant change in the Third Draft favored Iacono. Before Capano's death, Iacono and Capano had agreed that Capano's property management company would manage the Project once it was complete and leased. The Third Draft contemplated that the parties would "select a mutually acceptable management company" to serve as property

10

manager. *Id.* § 5.05(a). This change opened the door for Iacono's company, Sovereign, to bid for the property management work. The Third Draft also added a new provision that required any member to give the LLC a right of first offer on any adjoining property before developing the property independently. *See id.* § 6.09 (the "Right of First Offer").

Like the Second Draft, the Third Draft did not specify a dollar amount of capital that each member would contribute. That omission remained understandable, as the total amount of capital necessary for the venture had not been determined. There was no indication in the Third Draft that the members were departing from the 50/50 agreement on capital that Iacono and Capano had reached.

On September 9, 2015, Caterino responded to the Third Draft. Dkt. 49 Ex. H. His comments were generally detail-oriented and did not affect the basic structure of the deal:

- He argued for restoring the preferred return to 8%. *See id.*

- He wondered why the Capano team had struck the put-call provision. *See id.*

- He asked for clarity on who would guarantee the obligations of Capano's special purpose vehicle to ensure that there would be a financially capable entity or individual standing behind the special purpose vehicle's commitments. *See id.*

- He asked that an individual be identified as the manager for the Capano side rather than JAMCAP so that there would be a single person who would have authority to make decisions for the Capano team. *See id.*

In response to the Capano team opening up the position of property manager, Caterino asked that the LLC give that work to Sovereign. He noted that Iacono had agreed that "Capano Management [would] manage the project when Joe was alive," and argued that now "[i]t seems only fair that that same courtesy be extended to [Iacono]." *Id.*

Caterino pushed back hardest on the new Right of First Offer. He explained:

11

This section is problematic. Firstly, it is one sided in that Capano already has adjacent projects for which we are not partners that directly compete with this Project. [Iacono] is agreeable to this provision provided he is offered the opportunity to enter into the existing adjacent property units under mutually acceptable terms.

*Id.* Iacono thus wanted to be cut in on Phases 1 and 2 as the price of giving the LLC the Right of First Offer (the "Adjacent Property Management Right").

Terranova forwarded Caterino's comments to Duchemin, saying, "This is why I don't like [Caterino]." Dkt. 51 Ex. 22. He claimed it was "another instance where [Caterino] just does his own thing and does not have the courtesy to include me in the e-mail chain. Fine." *Id.* Duchemin responded, "WOW!!!! Could this be our ticket out . . . ." *Id.* It is not clear at this stage of the case why Terranova responded this way or why Duchemin would have thought that Caterino's comments could have provided a "ticket out." Construed in favor of Iacono for purposes of the motion for summary judgment, this email suggests that Capano's team was not negotiating in good faith and was looking for a way to escape from the joint venture.

**H.    The September Meeting**

On September 11, 2015, the parties met face to face in an attempt to finalize the terms of the LLC agreement. Iacono and Caterino attended from his side. Terranova, Duchemin, and Krapf attended from the Capano side.

During the meeting, the Capano team asked Iacono if he would consider putting in 75% of the required capital instead of 50%. Iacono Dep. 68. Iacono said that he would, but only if (i) Sovereign became the property manager for Phase 3 and (ii) Capano's estate repaid an otherwise unrelated loan that Iacono had given Capano in the amount of

12

$800,000. *Id.* at 68-69. Iacono said that if those conditions were unacceptable, he would stick with contributing 50% of the capital. *Id* at 69-70.

Iacono left the meeting believing that Capano's team would accept his conditional offer to contribute 75% of the capital. *Id.* at 70. He thought that deal was more favorable to Capano's team because he believed they were comparatively cash-constrained. *Id* at 71.

One week later, on September 18, 2015, Iacono sent Terranova and Duchemin an email in which he thanked them for allowing Sovereign to manage Phase 3 and asked if they would consider having Sovereign also manage Phases 1 and 2. Dkt. 51 Ex. 19. Terranova and Duchemin did not think they had agreed to let Sovereign manage Phase 3. Consistent with the language of the Third Draft, they thought they had proposed to bid out the work and let Sovereign bid like anyone else. *See id.* Terranova told Duchemin that they needed a property management company of their own. *See id.*

Meanwhile, Iacono's team was continuing to conduct due diligence and pursue financing. They sent out a financing request and spoke with lenders. Compl. ¶ 85. They also had follow-up meetings to discuss loan terms and select a lender. *Id.*

I.      **The Fourth Draft**

On September 21, 2015, Terranova sent another version of the LLC agreement to Caterino and Iacono. Dkt. 49 Ex. L (the "Fourth Draft"). The Fourth Draft continued to track the Second Draft in terms of the ownership and management structure.

The Fourth Draft resolved many of the minor issues that Caterino had identified. It provided that JAMCAP would designate a representative to act on its behalf to make decisions as manager. *See id.* § 5.01. It made clear that either Joanne or Capano's estate

13

would provide a personal guarantee. *See id.* § 4.01. It accepted Caterino's position on the preferred rate of return, restoring it to 8%. *See id.* § 1.01. The Fourth Draft also specified Sovereign as the initial property manager, subject to Sovereign and the LLC "entering into a mutually acceptable property management agreement" and reserving the LLC's right to hire a different management company if agreement could not be reached. *Id.* § 5.05.

The Fourth Draft continued to omit the put/call provision. More significantly, the Fourth Draft retained the Right of First Offer without providing Iacono with the Adjacent Property Management Right.

Most significantly, the Fourth Draft called for Iacono to contribute 75% of the capital and receive only a 50% member interest. *See id.* at 27. The Fourth Draft did not address the $800,000 loan, which Iacono had made a condition of his willingness to provide 75% of the capital.

On September 23, 2015, Caterino reiterated to Krapf that if Iacono contributed 75% of the capital, then *both* Sovereign had to be the property manager *and* Capano's estate had to repay the $800,000 loan plus interest. Krapf Dep. 119, 124. Krapf took the offer to Joanne, who rejected it. *Id.* at 122, 124, 128.

During this time, Iacono's team began to doubt whether the Capano team could fulfill their commitments under the Purchase Agreement without Capano's leadership. *See* Dkt. 49. Ex. O. They began considering how they could step in and acquire Phase 3 if the Capano team fell short. *See id.*; Dkt. 49 Ex. P at '361.

14

**J.      The Fifth Draft**

On September 24, 2015, Krapf sent a fifth version of the LLC agreement to Iacono. *See* Dkt. 49 Ex. P (the "Fifth Draft"). The Fifth Draft called for Iacono to contribute 75% of the capital to Phase 3. In a step back from the Fourth Draft, the LLC Agreement no longer provided for Sovereign to be the initial property manager. It also did not address the $800,000 loan.

Iacono rejected the draft. He understandably told Krapf:

> I don't like to be retraded[.] [Y]ou expect me to infuse 75% and now you delete [S]overeign as previously agreed[.] [T]his is unacceptable. If you insist then it is 50/50. If you wish to discuss I'm available by cell.

Dkt. 49 Ex. Q.

On September 29, 2015, Joanne told Krapf to terminate the discussions. Joanne Dep. 60. He did. *See* Dkt. 49 Ex. S.

Over the next two weeks, Iacono's team tried unsuccessfully to obtain Phase 3. On October 29, 2015, the Capano team closed on Phase 3.

**K.      This Litigation**

On December 23, 2015, the plaintiffs filed the complaint. It asserted seven causes of action:

- Count I asserted a claim on behalf of Iacono to enforce an oral contract with Capano to form a joint venture to acquire and develop Phase 3.

- Count II alleged in the alternative that Iacono could rely on and enforce Capano's promise to jointly acquire and develop Phase 3 under the doctrine of promissory estoppel.

- Count III alleged in the alternative that Iacono was entitled to relief under the doctrine of equitable estoppel.

15

- Count IV asserted a claim on behalf of Sovereign for tortious interference with prospective economic advantage based on Sovereign's interest in becoming the property manager for Phase 3.

- Count V asserted a claim on behalf of Iacono for tortious interference with prospective economic advantage based on his interest in pursuing a joint venture with Capano.

- Count VI asserted a claim for unjust enrichment on behalf of Iacono.

- Count VII sought a constructive trust over Phase 3.

The defendants moved for summary judgment on Count I. In their reply brief, they argued that if the court granted summary judgment on Count I, then it should also grant summary judgment on the other six counts.

## II.     LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). When a party moves for summary judgment, "the court must view the evidence in the light most favorable to the non-moving party." *Merrill v. Crothall–Am., Inc.*, 606 A.2d 96, 99 (Del. 1992). With the evidence viewed from this standpoint, the moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. *Brown v. Ocean Drilling & Expl. Co.*, 403 A.2d 1114, 1115 (Del. 1979). If the moving party meets this burden, then the non-moving party must "adduce some evidence of a dispute of material fact." *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *3 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009); *accord Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

16

An application for summary judgment must be denied "if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970).

> [T]he function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight. His function is rather to determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party. When that is the state of the record, it is improper to grant summary judgment.

*Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969). "The test is not whether the judge considering summary judgment is skeptical that [the non-movant] will ultimately prevail." *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002). "If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate." *Id.*

## A.    Count I: Breach Of Contract

In their motion for summary judgment and their opening brief, the defendants focused exclusively on Count I of the complaint, in which Iacono asserts a claim for breach of an oral agreement. "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiffs." *WaveDivision Hldgs., LLC v. Millennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, *13 (Del. Ch. Sept. 17, 2010). The defendants argued that summary judgment should be granted as a matter of law because a contract was never formed.

17

"A valid contract exists when (1) the parties intended that the [agreement] would bind them, demonstrated at least in part by its inclusion of all material terms; (2) these terms are sufficiently definite; and (3) the putative agreement is supported by legal consideration." *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018). The defendants do not dispute that the putative agreement was supported by consideration. They contend that Capano and Iacono did not agree on all material terms, and they implicitly argue that the terms were not sufficiently definite.

Overt manifestations of assent, rather than subjective intent, control contract formation. *See Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006). A contract must contain all material terms to be enforceable. *See id.* "What terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential." *Eagle Force*, 187 A.3d at 1230. The test for a valid oral contract thus is "whether a reasonable negotiator in the position above asserting the existence of a contract would have concluded in that setting, that the agreement reached constituted agreement on all the terms that the parties themselves regarded as essential and thus that agreement concluded the negotiations and formed a contract." *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986). "[C]ourts look to all of the surrounding circumstances, including the course and substance of the negotiations, prior dealings between the parties, customary practices in the trade or business involved and the formality and completeness of the document (if there is a document) that is asserted as culminating and concluding the negotiations." *Id.* at 1102 (citations omitted).

**1.**     **The Evidence That Could Support The Existence Of An Oral Contract**

Iacono asserts that an oral contract existed as a result of the agreement he reached with Capano during their meeting at the Kings Creek Country Club, as subsequently confirmed by their exchange of emails on July 15, 2015. Iacono testified that during the meeting at the Kings Creek Country Club, he and Capano agreed that "we were going to acquire [Phase 3] and that we were going to be 50/50." Iacono Dep. 34. The structure of the First Draft and the initial emails that were exchanged on July 15, 2015, indicate that Capano and Iacono may have had different understandings as to whether their agreement "to be 50/50" only extended to economic ownership, with Capano in control of the venture, or whether they would be 50/50 in all respects. Regardless, in the final email of the exchange on July 15, Capano agreed, "We should be equal in all respects." Dkt. 49 Ex. E.

Viewed in the light most favorable to Iacono as the non-movant, this evidence could support a finding that Capano and Iacono reached an enforceable oral agreement. Taken together, Iacono's testimony and the email exchange on July 15, 2015, are sufficient to support a finding that Iacono and Capano agreed to form a simple and straightforward joint venture in which they would acquire and develop Phase 3 as equal owners. The two material terms were ownership and control. As to both, they agreed to be "equal in all respects."

In considering whether a contract was formed, a court must take into account the facts of the specific case, including the parties' relationship, their history of dealing with each other, and the nature of the agreement. Capano and Iacono were seasoned real estate developers and close friends. *See* Iacono Dep. 19. They had talked about going into

19

business together for years. See *id* at 21. Given their mutual trust and respect, Capano and Iacono did not need to reach agreement on any terms beyond the basic issues of shared ownership and control. A reasonable observer could conclude based on their objective manifestations of assent that they agreed to move forward on the basis of a simple 50/50 joint venture. *Id.* at 39.

### 2. The Defendants' Arguments

The defendants argue that Capano and Iacono did not reach agreement on all material terms. The defendants' arguments might prevail following a trial on a full evidentiary record. They cannot carry the day on a motion for summary judgment.

The defendants attempt to create uncertainty as to the basic terms of the oral agreement. They assert that there was no agreement on the amount of capital contributions. *See* Dkt. 49 at 23. The further posit, "Assuming as true that Capano agreed to be 50/50 members with Iacono on 'the acquisition of the property and development of the Phase 3 project, what does that mean?" Dkt. 54 at 4 (footnote omitted). Following up on this rhetorical question, they ask, "[W]hat was each partner to contribute in capital?" *Id.*

When the evidence is viewed in the light most favorable to Iacono, there was an obvious and simple agreement on capital contributions: Iacono and Capano would each contribute 50% of whatever amounts were necessary to acquire the Project and develop Phase 3, however much that might be. Leaving that term open did not mean an infinite or indefinite commitment of capital. Both men were experienced real estate developers and would have had a sense of what the Project would cost. Moreover, Capano had shared his financial projections for the Project with Iacono before their meeting at Kings Creek

Country Club, so they were already on the same page as to the likely magnitude of the investment.

Further trying to complicate matters, the defendants observe that after Capano died, his side paid the deposit for the Project and eventually the $4.7 million purchase price. The defendants ask rhetorically how the joint venture would account for those payments. *Id.* When the evidence is viewed in the light most favorable to Iacono, the logical answer is that once the Project was assigned to the LLC, Capano would have been credited with a capital contribution equal to the $250,000 deposit that his side had funded. The balance of the obligations under the purchase agreement would have become obligations of the LLC. Under the parties' agreement, Iacono would have been expected to shoulder 50% of the total. It would not have been difficult for two experienced real estate professionals and friends to figure that out.

The defendants also challenge the basic agreement on shared control. They argue that Capano always controlled his entities, and that his nature was such that he would never have agreed to share control with Iacono. Iacono Dep. 23. After trial, the evidentiary record may support the defendants' position. For present purposes, the competing evidence gives rise to a material dispute of fact.

The defendants also try to create uncertainty about what shared control might mean. *Id.* at 5. According to the defendants,

> "management" has two separate meanings in this case. There is management, *i.e.*, decision-making and control on behalf of the company to be formed to design, develop, and construct the Project on the Property "pre-stabilization"), and there is what has been referenced as "post-stabilization" management, which is the control after the project is built and developed and

21

there are tenants leasing space. Iacono may have thought that he was a 50/50 partner with equal rights to make decisions and control the company during design, development, and construction stages, but there was no meeting of the minds between Iacono and Capano on this essential point.

*Id.* (citation and footnote omitted). To the contrary, when viewed in the light most favorable to Iacono, Capano's agreement that he and Iacono would be "equal in all respects" indicates that there was a meeting of the minds on this essential point.

The defendants also argue that "[s]trong evidence of Capano's intention is reflected in the First Draft of a 'to be formed'" LLC that he sent on July 13, 2015. Dkt. 49 at 23. This court has observed that "a clear intention to form an entity other than a general partnership may strongly suggest that the parties did not earlier form a partnership [by oral contract]." *Grunstein v. Silva* (*Grunstein I*), 2011 WL 378782, at *10 (Del. Ch. Jan. 31, 2011). But while *Grunstein I* made this observation, the decision did not rely on it to hold that no agreement existed as a matter of law. *Id.* Instead, *Grunstein I* denied the defendant's motion for summary judgment, and the case proceeded to trial. *Id.* at *13.

Under the Delaware Limited Liability Company Act (the "LLC Act"), a formal written LLC agreement is not required. *See* 6 *Del. C.* § 18-101(7). As a matter of law, an LLC agreement can be "written, oral or implied." *Id.* Consequently, "[t]he formation and governance of an LLC can be as simple or complex as the circumstances require." Robert Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 4.01[B] (2d ed. 2017). By specifically contemplating an "oral or implied" agreement, the statute necessarily envisioned the type of informal agreement that Capano and Iacono reached. *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 663 (Del. Ch. 2012)

22

(noting that by authorizing "oral or implied" agreements, as well as a wide range of possible "written" agreements, the LLC Act creates myriad opportunities for LLC agreements that range "from the minimalistic to the ill-formed to the simply incomplete"). If an oral or implied agreement does not cover every aspect of the parties' relationship, then the parties can rely on the LLC Act to supply default rules to govern their affairs. *See id.* At trial, evidence that Capano (and Iacono) contemplated a "to be formed" LLC with a written operating agreement could contribute to a finding that Capano and Iacono had not reached a definitive agreement, but it is not sufficient to grant summary judgment in favor of the defendants as a matter of law. As this court observed in *Grunstein I*, if "a definitive oral agreement was reached initially, [then] since later documents were never adopted, the initial agreement controls." 2011 WL 378782, at *10.

The defendants devote most of their briefing to describing the twists and turns in the evolution of the LLC agreement. *See* Dkt. 49 at 21–27; Dkt. 54 at 3, 7. They exaggerate the significance of the differences between the First and Second Drafts, describing them as "two ships passing in the night" and arguing that Capano and Iacono never reached agreement on all material terms. Dkt. 49 at 24.

The Second Draft accurately reflected Iacono and Capano's agreement that they would be "equal in all respects." Dkt. 49 Ex. E. Iacono's lawyer prepared the Second Draft, and in contrast to Capano's bare-bones First Draft, Iacono's lawyer added the types of provisions that one would expect in a more sophisticated LLC agreement. The provisions sought to anticipate and address the disputes that frequently arise in a 50/50 venture. For example, the Second Draft contained mediation and arbitration provisions, a put-call

23

mechanism to resolve an unbreakable deadlock, and a preferred return if one member ended up with more capital in the venture. A diligent lawyer serves up provisions like those to flesh out the principals' business deal. In each case, the Second Draft treated Capano and Iacono identically. The Second Draft was thus a more sophisticated version of a 50/50 joint venture, but it was still a 50/50 joint venture.

When the record is viewed in Iacono's favor for purposes of summary judgment, it is easy to conclude that none of the additional features of the Second Draft were material terms. They were "nice-to-have" provisions that would help the parties navigate the pitfalls of a 50/50 relationship, but none were essential.

The defendants likewise overstate the significance of the parties' negotiations over the "nice-to-have" provisions. After Capano's death, Joanne decided to proceed with Capano's deal with Iacono, and Terranova sent back the Third Draft. It was a mark-up rather than a rewrite, and it broadly accepted Iacono's version of the agreement. Several of the Capano side's changes reflected the fact that Capano had died and could no longer serve as the initial manager of the LLC or as one of its members. Most of the Capano team's revisions were minor, such as lowering the preferred return from 8% to 6% and providing that it would not accrue for the first thirty days, tweaking the arbitration provision, and striking the put/call mechanism. The most significant change favored Iacono by contemplating that the parties would "select a mutually acceptable management company" to take on the role of property manager, thereby opening the door to Sovereign serving in that role. *See* Dkt 49 Ex. G at 15.

In both their opening brief and reply brief, the defendants focus on the Capano side's request in September 2015 that Iacono contribute 75% of the capital to the venture. *See* Dkt. 49 at 25; Dkt. 54 at 25. When examined under the standard that governs a motion for summary judgment, this issue does not suggest a lack of agreement on material terms, but rather an effort by the Capano team to amend the agreement that Capano and Iacono reached. The deal between Capano and Iacono had always been that each would contribute 50% of the capital. When the Capano side proposed that Iacono contribute 75%, they were proposing to amend the deal. Iacono was willing to accept the change, but only if (i) Sovereign became the property manager for Phase 3 *and* (ii) Capano's estate repaid the $800,000 loan that Iacono had given Capano. Iacono Dep. 69. Iacono made clear that if those conditions were unacceptable, he would stick with the original deal. *Id.* at 70.

Capano's side did not accept Iacono's conditions, yet they sent drafts that called for him to contribute 75% of the capital. The deal broke down at this point. Read in the light most favorable to Iacono, the evidence could support a finding that there was an agreement on all material terms for a 50/50 joint venture, that Iacono was entitled to insist on that structure if the parties could not agree to modify it, and that the Capano side breached the agreement by refusing to proceed based on the original deal.

The defendants finally claim that "after Capano died, Iacono, along with his team, planned almost immediately to take this deal away from the Capano family, assuming that the Capano side, led by Terranova, would fail to obtain the funds to close." Dkt. 49 at 26. That is inaccurate. Read in the light most favorable to Iacono, the record certainly does not

reflect that. Even read in the light most favorable to the *movants*, the record does not suggest that Iacono "planned almost immediately" to take the deal.

There is evidence in the record that on September 23, 2015, Caterino suggested that if Terranova could not get the deal done, then Iacono could step in and acquire the Project. Dkt. 49 Ex. O. Caterino made this suggestion some six weeks after Capano died, almost two weeks after the September 11 meeting, and after the Capano side had sent back the Fourth Draft, in which the Capano side took the position that Iacono should contribute 75% of the capital yet receive only a 50% interest without satisfying Iacono's conditions for changing the deal. Read in the light most favorable to Iacono, Caterino's email reflects understandable frustration with the Capano side's actions, doubt about Terranova' s ability to execute, and contingency planning if the Capano side failed to fulfill the terms of the Purchase Agreement.

The next day, Krapf sent the Fifth Draft. It called for Iacono to contribute 75% of the capital to Phase 3. Dkt. 49. Ex. P. In a step back from the Fourth Draft, the LLC Agreement no longer provided for Sovereign to be the initial property manager. Read in the light most favorable to Iacono, the backward move was a signal that the Capano side did not want to proceed with the deal. Iacono read it that way, telling Krapf that he did not like "to be retraded" and that he would proceed with the original 50/50 deal. Dkt. 49 Ex. Q. Joanne then instructed Krapf to terminate discussions. Viewed in the light most favorable to Iacono, this sequence of events does not suggest an effort by Iacono to steal the deal. It rather suggests a failure by the Capano side to negotiate in good faith. It was after these events that Iacono tried unsuccessfully to obtain Phase 3.

26

### 3. The Defendants' Cases

To argue that summary judgment should be granted in their favor, the defendants rely on quotations from *Leeds* and *Ramone*. Neither decision granted a motion for summary judgment. Both decisions were rendered after trial. *See Ramone*, 2006 WL 905347, at *10; *Leeds*, 521 A.2d at 1097, Both involved more complex business ventures with more moving parts than the current case. The more apt precedent for this case is *Grunstein I.*

#### a. *Leeds*

The *Leeds* decision involved a suit by the plaintiff, Leonard Leeds, to establish that he had not formed a binding contract to sell a nursing home. 521 A.2d at 1097. The defendant and putative buyer was a company owned by Malcom Glazer, the well-known entrepreneur, who was represented during parts of the negotiations by William Sondericker, a relatively junior lieutenant.

Leeds had placed an advertisement soliciting buyers for the nursing home, and Sondericker responded. *Id.* at 1098. Leeds told Sondericker that he wanted to take back tax-exempt industrial revenue bonds as part of the purchase price ("IRB financing"). *Id.* The benefits to Leeds from using tax-exempt bonds were obvious, and he told Sondericker that if the buyer used IRB financing, then the sale price would be $3.5 million; otherwise, the price would be $4.5 million. *Id.* Sondericker recalled Leeds asking for $4 million and mentioning IRB financing, but he claimed not to understand its significance other than as a form of seller financing. *Id.* Leeds asked for a down payment of $1 million in cash, with the balance of the consideration taking the form of twenty-five-year bonds that paid 12%

27

interest. *Id.* Sondericker reported the terms to Glazer, who thought Leeds wanted too much cash. *Id.*

Six weeks later, Sondericker contacted Leeds again. A series of discussions ensued, during which Leeds again mentioned IRB financing, but eventually signaled a willingness to take $750,000 in cash. *Id.* At that point, Glazer became interested, and he took over the negotiations. *Id.* He offered to buy the nursing home for $3.5 million with a down payment of $500,000. *Id.* The parties quickly compromised on $600,000. *Id.* at 1099.

Glazer sent Leeds a letter of intent that described a total purchase price of $3.5 million, a down payment of $600,000 in cash, and a $2.9 million bond "to be taken back by Seller, payable principal and interest at 12%" over twenty-five years. *Id.* at 1099. The letter of intent did not specify IRB financing. Leeds prepared a detailed letter identifying additional terms for the transaction, including IRB financing, but he did not send it. Instead, he signed and returned the letter of intent. *Id.*

A month later, the parties met for a day-long meeting to finalize the details of the transaction. They "could agree on virtually nothing." *Id.* at 1101. Leeds took the position that IRB financing was part of the deal and that Glazer should pay the financing fees. Glazer took the position that IRB financing was not part of the deal and that if Leeds wanted it, he should pay for it. *Id.* The parties also could not agree on "[s]uch minor points as who would pay for title insurance and transfer taxes." *Id.* By the end of the day, Leeds decided that he did not want to do business with Glazer. About a month later, Leeds wrote to Sondericker disclaiming any interest in a transaction. Sondericker replied that there was already a signed agreement in the form of the letter of intent. *Id.* at 1101.

Considering these facts in a post-trial decision, Chancellor Allen held that a contract to sell the nursing home had not been formed. *Id.* at 1102–03. He framed the issue as whether a reasonable person would conclude that the parties intended to be bound based upon their objective manifestations of assent, cautioning that it was "not a simple or mechanical test to apply." *Id.* at 1101.

> Negotiations typically proceed over time with agreements on some points being reached along the way towards a completed negotiation. It is when all of the terms that the parties themselves regard as important have been negotiated that a contract is formed. In determining whether agreements reached were meant to address all of the terms that a reasonable negotiator should have understood that the other party intended to address as important, courts look to all of the surrounding circumstances, including the course and substance of the negotiations, prior dealings between the parties, customary practices in the trade or business involved and the formality and completeness of the document (if there is a document) that is asserted as culminating and concluding the negotiations.
>
> Until it is reasonable to conclude, in light of all of these surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly or (through prior practice or commercial custom) implicitly resolved, the parties have not finished their negotiations and have not formed a contract. Agreements made along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional and tentative. Negotiation of complex, multi-faceted commercial transactions could hardly proceed in any other way.

*Id.* at 1101–02 (citations omitted).

Applying this test to the facts, Chancellor Allen found that the letter of intent "clearly evidences agreement concerning key elements of the transaction," such as "price, principal amount of the note, its term and interest rate." *Id.* at 1102. But he nevertheless held "in light of all the circumstances" that a reasonable person "could not have understood that the November 15 document represented a completed negotiation." *Id.* Most

29

importantly, he believed that Sondericker and Glazer "knew that IRB financing was an important point that Leeds had brought up on several occasions," and it was not reasonable for them to think that Leeds had dropped the issue. Chancellor Allen also observed that

> while it is surely possible to make a binding contract to sell a $3.5 million business, including real estate, on a single page, it would be extraordinary to do. Absent a clear indication that the other party intended that unusual course, a reasonable commercial negotiator—and surely one with Mr. Glazer's experience—could not conclude in these circumstances that that was intended. For example, putting aside the question of the impact on the transaction of having IRB financing available, there are myriad topics and terms utterly conventional when a commercial seller in a significant transaction takes back a note—such as financial covenants, including restrictions on dividends or other stockholder distributions; warranties concerning the financial condition and due organization of the maker of the note; and terms defining and governing defaults and cures of default. There is no legal requirement that these topics be dealt with before negotiations resulting in agreements may be regarded as having concluded in a contract. But, unless there is some affirmative basis to suppose that the parties actually intended to pass over such points, a reasonable negotiator in a transaction of this size and type would not be justified in concluding that such was the unexpressed intention.

*Id.* at 1102–03. Chancellor Allen also cited the fact that neither Leeds nor Glazer "really thought of the negotiations as having been completed" when they signed the letter of intent; they instead viewed the subsequent meeting as a forum for additional negotiations. In addition, no one from Glazer's side had seen the nursing home. *Id.* at 1103. Chancellor Allen therefore concluded that when Leeds signed the letter of intent, "[t]he negotiations had not yet reached the point at which a contract was formed." *Id.*

There are sufficient differences between this case and *Leeds* to conclude that *Leeds* does not compel the granting of summary judgment. Most important, the procedural postures are different. That *Leeds* decision was issued after a two-day trial, during which

30

Chancellor Allen had the opportunity to consider evidence and hear testimony. *Id.* at 1097. In this case, the defendants have moved for summary judgment, which requires viewing the evidence in Iacono's favor.

Next, the transaction in *Leeds* was more complex that than a 50/50 joint venture. The transaction in *Leeds* involved the sale of a nursing home, including the related real estate, using tax-exempt IRB financing, which required compliance with a governing regulatory scheme. The Capano/Iacono transaction was a 50/50 joint venture in which both sides would be equal in all respects. It is true that the men planned to purchase and develop real estate, but that was not the subject of the agreement that they reached between themselves. The purchase of the Project was governed by the formal Purchase Agreement. The agreement at issue in this case was between Capano and Iacono. It is also true, as in *Leeds*, that the development of Phase 3 would necessitate the investment of several million dollars in capital, but unlike in *Leeds*, the record at this stage suggests that Capano and Iacono were comfortable investing significant sums on a relatively informal basis. For example, Iacono had loaned $800,000 to Capano on an informal basis, and he also made a loan at Capano's request to an associate of Capano's whom Iacono did not know. *See* Iacono Dep. 30.

A third critical distinction involves "the surrounding circumstances, including the course and substance of the negotiations [and] prior dealings between the parties." *Leeds*, 521 A.2d at 1102. Unlike the parties in *Leeds*, Capano and Iacono were close friends who trusted one another. They had previously talked about investing together, and they reached agreement on a 50/50 joint venture through negotiations that they conducted themselves.

31

They immediately manifested their agreement by telling their associates about it, and they both acted as if an agreement had been reached. In *Leeds*, by contrast, the buyer and seller had never met. The initial discussions took place between Leeds and Sondericker, with Glazer only becoming involved later. And although Leeds and Glazer signed the letter of intent, neither viewed the document as the final deal.

These distinctions do not mean that *Leeds* is not an instructive precedent or that Iacono will prevail at trial. As in *Leeds*, the court could conclude after weighing the evidence that Iacono and Capano contemplated memorializing their venture in a written agreement that would involve further negotiation. It is also possible that the court could conclude that some of the open terms were material. What matters for present purposes is that *Leeds* does not support granting judgment as a matter of law.

### b. *Ramone*

The defendants also rely on *Ramone*. There, Michael Ramone sought to establish that he and Jeffery Lang had formed a binding contract to acquire a building and operate a swimming pool and fitness center. *Ramone*, 2006 WL 905347, at *1.

Ramone and Lang had learned independently that the Newark YWCA was for sale. Both were interested, and they coincidentally ran into each other in the YWCA's parking lot. They discussed their interest in the property, but "nothing concrete came out of these early discussions." *Id.* at *2. Subsequently, without Ramone's input or involvement, Lang entered into an agreement to buy the YWCA for $1.4 million, conditioned on the property being rezoned for commercial use. *Id.*

About a month later, Ramone and Lang began to discuss a possible business venture. *Id.* at *3. During their discussions, they explored a series of possible deal structures. One involved Ramone renting the pool facility from Lang. *Id.* Another involved Ramone purchasing the pool facility and Lang retaining the rear portion of the property. *Id.*

Lang sent Ramone an email that identified proposed deal terms for a joint purchase of the property and a lease to Ramone's business. The email including the purchase price for the property, estimated closing costs, and the key terms of the lease. *Id.* at *3. Ramone was supposed to send Lang comments on the proposed deal structure. *Id.* Lang then sent Ramone a proposed LLC agreement. *Id.* It called for Lang and Ramone to each own a 50/50 member interest in an LLC that would own the building and lease 85% of it to Ramone and the rest to Lang. *Id.*

Later that month, Lang prepared two different descriptions of the deal. In each version, Ramone and Lang were 50/50 members of an LLC that would own the property, but the other terms of the deal varied. *Id.* Lang sent the proposals to Ramone and asked for information to refine them, which Ramone did not provide. Over the next two months, the parties continued to discuss different frameworks, including a new alternative in which Ramone would acquire the property, and another in which Ramone would have no interest in the property but would receive an option to buy the pool facility. *Id.*at *5.

The closest the parties came to an agreement was after a meeting on July 8, 2005, when Lang sent Ramone an email proposing the following terms:

- Ramone and Lang would join a LLC on a 50% basis . . . ;
- Ramone would lease the building for $10 per square foot triple net;

33

- Lease payments would be held in an operating account only used for capital needs if they occur;

- Ramone would have the option to buy out Lang's 50% interest in the LLC one year and one day after the closing for $150,000 plus any equity that Lang put into the deal, approximately $70,000, for a total purchase price of $1.55 million;

- Ramone would transfer the back parcel on the Property to Lang for development; and

- Improvements to the building and pool would be completed in order for both to be open by September 1 for use by Ramone.

*Id.* Ramone responded, "This sounds like what I am looking for. I do not understand the . . . tax implications. I am also uncertain of some details concerning the additional parcel, however I think we are close enough to warrant us getting this done." *Id.* (internal quotation marks omitted).

While seeking to have the property rezoned for commercial use, Lang represented that he and Ramone were partners in the venture. *Id.* at *3. After Lang succeeded in rezoning the property, he sent Ramone a new set of terms. It provided more detail about the loan and the renovations. It also removed the buyout option. *Id.* at *6. Lang asked Ramone to respond by week's end. *Id.* Ramone never responded. *Id.*

Frustrated by Ramone's silence, Lang had his lawyer tell Ramone that he would only proceed with a deal that did not include a buyout option. *Id.* The lawyer gave Ramone a firm deadline to respond. *Id.* Ramone did not respond. Instead, later that month, Ramone and Lang briefly discussed a different structure that involved bringing in a third-party investor and reducing the rent. *Id.* at *7. Lang hoped to finalize a set of documents, and he asked Ramone to provide certain information to his attorney. After Ramone provided it,

34

Lang asked Ramone to address four other issues. Ramone responded, but did not comment on the LLC agreement or the lease. *Id.* The parties never finalized the documentation, and Lang closed on the property without Ramone. *Id.* at *9.

Considering these facts after trial, the court found that a binding agreement had not been formed. *Id.* at *10. Ramone contended that he formed a contract by accepting Lang's email dated July 8, 2005. The court found that a reasonable person would not have concluded from Ramone's response that a contract had been formed:

> [A]lthough in that email Ramone signals his general agreement in moving forward on the structure Lang described, Ramone's words in the email do not reflect a commitment to the exact terms outlined by Lang—as reflected in his caveats that he does not understand certain aspects of Lang's proposal and that he is uncertain about another aspect. Ramone's own subjective and after-the-fact view that this email was acceptance is not sufficient to prove he manifested objective assent. In addition, through his suggestion that they meet to finalize the details, Ramone's response (e.g., that they were close enough) indicates that further negotiation was needed in order for a contract to have been created. Since acceptance is the ultimate step in making a contract, the commitment cannot be conditioned on some final step to be taken by the offeror.

*Id.* (internal quotation marks omitted). The court thus concluded that even if Lang's email was an offer, Ramone's response was not an acceptance. *Id* at *11.

The court also found that the parties had not agreed on all material terms. The court observed that "[n]egotiations continued throughout July, over various terms, including the possibility of a buyout option, the amount of space Ramone would lease, and the price per square foot." *Id.* The continuing negotiations on substantive issues demonstrated that an enforceable contract was not in place. *Id.* The court also noted that the idea of a third investor was introduced late in the negotiations, which changed the entire deal structure.

35

*Id.* The court rejected the idea that the July 8 email reflected anything other than "a renewed interest to negotiate a deal structure together of some sort." *Id.*

As with *Leeds*, there are significant differences between this case and *Ramone*. Like *Leeds*, *Ramone* was a post-trial opinion, and the court had the opportunity to consider evidence and hear testimony. *Id.* at *1. Here, the defendants moved for summary judgment.

Even more so than *Leeds*, the facts in *Ramone* involved a complex deal structure. One component of the arrangement contemplated an LLC in which Lang and Ramone would be 50/50 members, but the similarities with this case end there. The transaction in *Ramone* involved other components in which the parties' interests were neither equal nor aligned. Most notably, Ramone would lease a portion of the building and receive a non-reciprocal option to acquire Lang's interest in the LLC. If Ramone exercised the option, then the LLC would transfer a portion of the property to Lang so that he could develop it. Because the parties' interests in these points were not aligned, the material terms of those arrangements needed to be negotiated. The Iacono/Capano deal, by contrast, was a simple 50/50 joint venture. Unlike *Ramone*, this case did not involve multi-step bargaining.

The facts of *Ramone* also lacked evidence of an initial agreement between the principals, comparable to the deal between Capano and Iacono. They reached broad agreement on a 50/50 joint venture during their meeting at Kings Creek Country Club and resolved the last issue by email. Ramone and Lang discussed a series of widely differing deal structures, never zeroing in on any of them.

Finally, as in *Leeds*, the relationship between the parties was different. Lang and Ramone were acquaintances, but not close friends. It was not credible that Lang and

36

Ramone reached agreement on a complex deal structure that they kept recasting as their discussions continued. Capano and Iacono were close friends who trusted one another. Given their history together, Capano and Iacono could have reached agreement on a simple 50/50 joint venture.

As with *Leeds*, these distinctions do not mean that *Ramone* is not an instructive precedent. What matters for present purposes is that *Ramone* does not support entering judgment as a matter of law in the defendants' favor.

### c. *Grunstein I*

Rather than *Leeds* or *Ramone*, the more informative case is *Grunstein I*. There, plaintiffs Leonard Grunstein and Jack Dwyer argued that they had reached an oral agreement with defendant Ronald Silva to form a joint venture to acquire a large provider of healthcare and rehabilitative services to the elderly that owned approximately 345 nursing home facilities throughout the United States. *Grunstein I*, 2011 WL 378782, at *1. As in this case, Grunstein and Dwyer contended that they had reached agreement with Silva on "a very simple partnership. Equal partners." *Id.* at *2. As in this case, none of the terms were memorialized in a signed writing. *See id.* As in this case, the parties did circulate several documents that contemplated forming an LLC. *See id.* at *3–5.

As in this case, the parties in *Grunstein I* acted in conformity with the putative oral agreement. There, they created three special purpose vehicles and caused them to enter into a merger agreement to acquire the nursing home services company. *See id.* at *3. The merger agreement was then amended to substitute entities that Silva controlled. *See id.* at

37

*4. After closing, Silva refused to share ownership with the plaintiffs, claiming no agreement existed. *See id*. at *2, 5.

The defendants moved for summary judgment, and the court denied the motion. *Id.* *1. Viewing the evidence in the light most favorable to Grunstein and Dwyer, the court found that the record could support the existence of a joint venture agreement. *Id.* at *10. The court held that the existence of the unsigned LLC agreements did not prevent the plaintiffs from proving the existence of a binding oral agreement, explaining that if "a definitive oral agreement was reached initially, [then] since later documents were never adopted, the initial agreement controls." *Id.* at *10.

*Grunstein I* is informative for a series of reasons. First, *Grunstein I* and this case share the same procedural posture—a motion for summary judgment. Second, at a high level, they involve similar transaction structures, with principals agreeing among themselves to form a joint venture that engages in a transaction with a third party. Third, if anything, the facts in *Grunstein I* seem more likely to have supported a ruling that no agreement existed as a matter of law than the facts in this case.

The greater complexity in *Grunstein I* extended to both the joint venture and the third-party transaction. The putatively "simple partnership" was not so simple. There were at least three and possibly four principals, making the arrangement inherently more complicated. One of the principals was itself a major institution, the investment bank Credit Suisse/First Boston. There was ostensibly a side agreement under which Credit Suisse would provide a bridge loan in return for its equity interest, but that interest could be converted into a fee arrangement. *Id.* at *3. There was also ostensibly a side deal under

38

which Dwyer would secure long term financing in return for his interest, but he too could convert his interest into a fee arrangement. Dwyer also maintained that he had the right to a pre-paid fee as an advance on his compensation. *Id.* at *2. Grunstein and Silva were supposed to invest cash in the deal. *Id.* at *4. It was not clear whether Dwyer participated in the meeting at which the putative joint venture was formed. *Id.*

The nature of the third-party deal was even more complex. It involved the acquisition of a major corporation for $2.2 billion. The parties contemplated financing the deal through a combination of a short-term bridge loan, cash from the principals, equity financing from third parties, and a special type of HUD-insured debt, which had to satisfy certain regulatory requirements. The initial agreement with the third party was subsequently amended on three occasions to revise its terms. *See id.*at *4-5. The third amendment resulted in Grunstein's interest in the joint venture being converted into a carried interest. *Id.* at *9.

In contrast to the current case, there was no indication in *Grunstein I* that any of the principals had the type of longstanding and trusting friendship that existed between Capano and Iacono. Grunstein and Dwyer appeared to have invited Silva into the deal at the suggestion of Credit Suisse. *Id.* at *2.

Despite far more complex facts in *Grunstein I*, the court denied the defendants' motion for summary judgment, and the case went to trial. That ruling supports the denial of the defendants' motion for summary judgment in this case.

39

### 4. Summary Judgment Denied On Count I

Viewed in the light most favorable to Iacono, the record could support a finding that Capano and Iacono agreed on all material terms. Moreover, assuming for the sake of argument that Iacono and Capano did not agree on all material terms, the evidence viewed in the light most favorable to Iacono indicates that they agreed, at a minimum, on the general structure of a joint venture and committed to negotiate in good faith over the terms of an LLC agreement. An agreement to negotiate in good faith is itself an enforceable agreement. *See, e.g.*, *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330 (Del. 2013). There are complexities to the analysis, such as the implications of Capano's death, but there is blackletter authority which indicates that an enforceable agreement to negotiate in good faith could have been reached. *See Restatement (Second) of Contracts* § 262 cmt. b. (Am. L. Inst. 1981); 17B C.J.S. *Contracts* § 691, Westlaw (database updated June 2020).

Viewed in the light most favorable to Iacono, the record could support a finding that Capano and Iacono entered into an enforceable oral agreement. The defendants' motion for summary judgment must be denied.

### B. The Plaintiffs' Other Claims

The defendants did not move for summary judgment in their opening brief on any claims other than Count I. In their reply brief, they asserted that if this court were to grant summary judgment on Count I, then that holding "eviscerates the remaining claims" and necessitates granting summary judgment on those as well. Dkt. 54 at 18. This court has not granted summary judgment on Count I, and it is not possible to grant summary judgment in the defendants' favor on the other claims.

### III. CONCLUSION

The defendants' motion for summary judgment is denied.